Citation Nr: 1826275 
Decision Date: 04/18/18 Archive Date: 05/07/18

DOCKET NO. 15-30 729 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Louis, Missouri


THE ISSUES

1. Entitlement to an initial rating in excess of 10 percent prior to August 17, 2005, for service-connected right knee degenerative joint disease (DJD).

2. Entitlement to a rating in excess of 50 percent from October 1, 2006, to August 4, 2013, and in excess of 30 percent thereafter for service-connected right knee DJD, status post joint replacement.

3. Entitlement to a total disability evaluation based on individual unemployability (TDIU).


REPRESENTATION

Veteran represented by: Katie L. Ambler, Attorney-at-Law



WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

L. Bristow Williams, Associate Counsel


INTRODUCTION

The Veteran served on active duty from February 1958 to February 1962. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from an August 2013 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Louis, Missouri, which granted the Veteran's claim of service connection for DJD, right knee, status post joint replacement, and assigned a 10 percent evaluation effective April 11, 2005, a 100 percent evaluation effective August 17, 2005, a 50 percent evaluation effective October 1, 2006, and a 30 percent evaluation effective August 5, 2013. 

In December 2017, the Veteran testified before the undersigned Veterans Law Judge at a videoconference hearing; a transcript of the hearing is associated with the claims file.

Pursuant to Rice v. Shinseki, 22 Vet. App. 447 (2009), a claim for a TDIU is part of an initial rating claim when such claim is expressly raised by the veteran or reasonably raised by the record. The Veteran has asserted that he is unable to work as a result of his service-connected right knee disability. See December 2017 Hearing Transcript. Therefore, the Board has jurisdiction over this issue as part and parcel of his claim for higher ratings, and has listed the issue on the title page.

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2017). 38 U.S.C. § 7107(a)(2) (2012).

The issues of entitlement to an increased ratings from October 2006 to the present for service-connected DJD, right knee status post joint replacement, and entitlement to a TDIU are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDING OF FACT

Prior to August 17, 2005, DJD of the right knee was demonstrated by X-ray evidence of degenerative changes with painful motion, and moderate instability.


CONCLUSIONS OF LAW

1. The criteria for an initial disability rating in excess of 10 percent for a right knee disability based on pain and limitation of motion have not been met, prior to August 17, 2005. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.10, 4.40, 4.45, 4.59, Diagnostic Code 5003 (2017).

2. The criteria for a separate initial disability rating of 20 percent for moderate right knee instability have been met, prior to August 17, 2005. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.10, 4.40, 4.45, 4.71a, Diagnostic Code 5257 (2017).


REASONS AND BASES FOR FINDING AND CONCLUSIONS

I. Duties to Notify and Assist

With respect to the Veteran's claims decided herein, no notice or duty to assist deficiencies have been alleged by the Veteran or his attorney. See Scott v. McDonald, 789 F.3d 1375, 1381 (Fed. Cir. 2015) (holding that "the Board's obligation to read filings in a liberal manner does not require the Board . . . to search the record and address procedural arguments when the veteran fails to raise them before the Board.") Dickens v. McDonald, 814 F.3d 1359, 1361 (Fed. Cir. 2016) (applying Scott to a duty to assist argument).

II. Increased Ratings 

Disability evaluations are determined by evaluating the extent to which a veteran's service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, including employment, by comparing his symptomatology with the criteria set forth in the Schedule for Rating Disabilities (Rating Schedule). 38 U.S.C. § 1155; 38 C.F.R. §§ 4.1, 4.2, 4.10. If two evaluations are potentially applicable, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that evaluation; otherwise, the lower evaluation will be assigned. 38 C.F.R. § 4.7. The Veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995).

The Board will consider entitlement to staged ratings to compensate for times since filing the claim when the disability may have been more severe than at other times during the course of the claim on appeal. Fenderson v. West, 12 Vet. App. 119 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007).

In addition, when assessing the severity of musculoskeletal disabilities that are at least partly rated on the basis of limitation of motion, VA must also consider the extent that the Veteran may have additional functional impairment above and beyond the limitation of motion objectively demonstrated, such as during times when his symptoms are most prevalent ("flare-ups") due to the extent of his pain (and painful motion), weakness, premature or excess fatigability, and incoordination - assuming these factors are not already contemplated by the governing rating criteria. DeLuca v. Brown, 8 Vet. App. 202, 204-07 (1995); see also 38 C.F.R. §§ 4.40, 4.45, 4.59.

Painful, unstable, or malaligned joints, due to healed injury, are entitled to at least the minimal compensable rating for the joint. 38 C.F.R. § 4.59; Burton v. Shinseki, 25 Vet. App. 1 (2011).

Knee disabilities are unique in the rating code, as they are one of a few orthopedic disabilities in which a Veteran may receive multiple ratings based on separate symptoms in the same joint. While the law generally prevents considering the same symptoms under various diagnoses to support separate ratings, some of the relevant Diagnostic Codes for the knee have been interpreted to apply to different functions of the knee, therefore warranting separate consideration. Specifically, the evidence may warrant separate ratings for limitation of flexion of the knee, limitation of extension of the knee, and lateral instability and recurrent subluxation of the knee. 

However, the Court has held that a veteran may not be compensated twice for the same symptomatology as "such a result would over compensate the claimant for the actual impairment of his earning capacity." Brady v. Brown, 4 Vet. App. 203, 206 (1993). This would result in pyramiding, contrary to the provisions of 38 C.F.R. § 4.14. The Court has acknowledged, however, that when a veteran has separate and distinct manifestations attributable to the same injury, he should be compensated under different Diagnostic Codes. Esteban v. Brown, 6 Vet. App. 259 (1994); Fanning v. Brown, 4 Vet. App. 225 (1993). The Board will explore all possibilities in this case.

Under Diagnostic Code 5256 (Knee, ankylosis of), a disability rating of 40 percent is warranted for ankylosis of the knee in flexion between 10 degrees and 20 degrees, a 50 percent disability rating is warranted for ankylosis of the knee in flexion between 20 degrees and 45 degrees and a 60 disability percent rating (the maximum schedular disability rating) is warranted for extremely unfavorable ankylosis of the knee in flexion at an angle of 45 degrees or more. 38 C.F.R. § 4.71a, Diagnostic Code 5256.

Under Diagnostic Code 5257, 10, 20, and 30 percent ratings are warranted for slight, moderate, or severe recurrent subluxation or lateral instability, respectively. The Board observes that the words "slight," "moderate," and "severe" as used in the various Diagnostic Codes are not defined in the Rating Schedule. Rather than applying a mechanical formula, the Board must evaluate all of the evidence, to the end that its decisions are "equitable and just." 38 C.F.R. § 4.6.

Under Diagnostic Code 5258, a maximum 20 percent rating is warranted for dislocated semilunar cartilage with frequent episodes of locking, pain, and effusion into the joint. Diagnostic Code 5259 holds that symptoms due to the removal of the semilunar cartilage of either knee warrant a 10 percent rating, which is the maximum rating under that diagnostic code.

Diagnostic Code 5260 rates based on limitation of flexion, and provides for a noncompensable rating where flexion is limited to 60 degrees; a 10 percent rating where flexion is limited to 45 degrees; a 20 percent rating is warranted where flexion is limited to 30 degrees; and a 30 percent rating is warranted where flexion is limited to 15 degrees.

Under Diagnostic Code 5261, a 10 percent rating requires extension limited to 10 degrees. A 20 percent rating is warranted where extension is limited to 15 degrees and a 30 percent rating is warranted where extension limited to 20 degrees. For a 40 percent rating, extension must be limited to 30 degrees. And finally, where extension is limited to 45 degrees a 50 percent rating may be assigned.

The diagnostic criteria applicable to impairment of the tibia and fibula are found at 38 C.F.R. § 4.71a, Diagnostic Code 5262. Under that code, a 10 percent evaluation is warranted when malunion of the tibia and fibula is productive of slight knee or ankle disability. A 20 percent evaluation is warranted when malunion of the tibia and fibula is productive of moderate knee or ankle disability, and a 30 percent evaluation is warranted when such disability is marked. A 40 percent evaluation is warranted for nonunion of the tibia and fibula, with loose motion, requiring a brace. Diagnostic Code 5263 is the rating code for genu recurvatum. Genu recurvatum is a deformity in the knee in which the knee bends backwards.

Additionally, when a knee replacement has occurred, pursuant to Diagnostic Code 5055, prosthetic replacement of a knee joint is rated 100 percent for one year following implantation of the prosthesis. (The one-year total rating commences after a one-month convalescent rating under 38 C.F.R. § 4.30). Thereafter, chronic residuals consisting of severe painful motion or weakness in the affected extremity warrant a 60 percent rating. Intermediate degrees of residual weakness, pain, or limitation of motion are rated by analogy to Diagnostic Codes 5256, 5261, or 5262. The minimum rating following replacement of a knee joint is 30 percent. 38 C.F.R. § 4.71a, Diagnostic Code 5055.

The assignment of a particular diagnostic code is "completely dependent on the facts of a particular case" and the Board can choose the diagnostic code to apply so long as it is supported by reasons and bases as well as the evidence. Butts v. Brown, 5 Vet. App. 532, 538 (1993). One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, diagnosis, and demonstrated symptomatology. Any change in diagnostic code by a VA adjudicator must be specifically explained. See Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992). It is permissible to switch Diagnostic Codes to reflect more accurately a claimant's current symptoms. See also Read v. Shinseki, 651 F.3d 1296, 1302 (Fed. Cir. 2011) (holding that service connection for a disability is not severed when the diagnostic code associated with it is changed to determine more accurately the benefit to which a veteran may be entitled). 

When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant. 38 U.S.C. § 5107; Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

Disability Rating Prior to August 17, 2005

The Veteran's service-connected DJD of the right knee is currently evaluated under the provisions of 38 C.F.R. § 4.71(a), Diagnostic Code 5055, which pertains to the prosthetic replacement of the knee joint. Pertinently, however, the Veteran did not undergo a total right knee replacement until August 2005. The Veteran and his attorney assert that for the time period prior to the replacement, a 10 percent rating under Diagnostic Code 5003 (arthritis) is warranted, as well as a separate 30 percent rating based instability of the knee. The Board notes that a single 10 percent rating is already in effect for the time period prior to August 17, 2005. 

As noted above, VA has a duty to acknowledge and consider all regulations that are potentially applicable through the assertions and issues raised in the record, and to explain the reasons and bases for its conclusions. See Schafrath v. Derwinski, 1 Vet. App. at 589. Therefore, although Diagnostic Code 5055 is not applicable during the time period prior to August 17, 2005, the Board will consider whether the Veteran can receive higher ratings for his right knee disability under all other applicable diagnostic codes. 

Prior to August 17, 2005, the Veteran had a diagnosis of medial joint line arthritis and severe patellofemoral arthritis of the right knee. See July 2005 Dr. P.K.B. Examination Report. The Veteran had also undergone arthroscopic surgery with a partial meniscectomy. See November 1997 Dr. K.A.K. Surgical Report. The Board notes that Diagnostic Codes 5003, 5258, and 5259 may be applicable in this case. 

With any form of arthritis, painful motion is an important factor. It is the intent of the rating schedule to recognize actually painful, unstable or mal-aligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59. A compensable evaluation under Diagnostic Code 5003 and 38 C.F.R. § 4.59 (for painful motion) is in order where arthritis is established by X-ray findings and no compensable limitation of motion of the affected joint is demonstrated. See Lichtenfels v. Derwinski, 1 Vet. App. 484, 488 (1991); see also VAOPCGPREC 9-98 (Aug. 14, 1998). Where a compensable limitation of motion is demonstrated in the joint, the Lichtenfels rule is not applicable. For the purpose of rating disability due to arthritis, the knee is considered a major joint. 38 C.F.R. § 4.45(f).

During the December 2017 Board hearing, the Veteran reported difficulty standing, walking, and climbing stairs due to pain prior to his total knee replacement. Upon examination in July 2005, X-ray findings supported a diagnosis of medial joint line arthritis and severe patellofemoral arthritis of the right knee. See July 2005 Dr. P.K.B. Examination Report. His right knee presented range of motion from 0 to 120 degrees. Based upon this examination, the Board finds that the Veteran's arthritis was established by X-ray findings and his range of motion was not limited so as to warrant compensable ratings under Diagnostic Code 5260 and 5261. Thus, a 10 percent evaluation, but no higher, is warranted under Diagnostic Code 5003. As noted above, the Veteran and his attorney specifically requested that the 10 percent rating currently in effect be maintained under Diagnostic Code 5003. 

With respect to subluxation and instability, the Veteran asserts that he is entitled to a separate disability rating of 30 percent under Diagnostic Code 5257, essentially arguing that he would not have had a total knee replacement but for severe symptoms of instability and pain just prior to his surgery. See December 2017 Hearing Transcript; see also February 2017 Claimant's Brief.

During the December 2017 Board hearing, the Veteran reported difficulty controlling the movement of his knee prior to his total knee replacement. Specifically, he stated that if he stepped off something "wrong," his knee would come out from underneath him and he would fall to the ground. Id. He stated that he had to concentrate while climbing and take the step "just right" or else he would fall. Id. The Veteran also reported that a limited range of motion in his right knee caused him to catch his toe when walking. Id.

However, upon examination in July 2005, the Veteran was reported to have "good stability" in his right knee. See July 2005 Dr. P.R.B. Examination Report. This is the only stability assessment during the April through August 2005 period under review. 

In considering the Veteran's competent lay statements regarding instability and giving way of his knee prior to his surgery, and the objective findings of Dr. P.R.B. noting that the Veteran had "good stability of the right knee," the Board finds that with respect to subluxation and instability, the evidence demonstrates that symptoms most closely approximate instability symptoms of "moderate" severity, warranting a 20 percent rating under Diagnostic Code 5257. 

A rating higher than 20 percent is not warranted because severe instability or laxity in the right knee is simply not shown by the evidence during the period of time under review. As noted, in July 2005, there was no objective evidence of joint or ligamentous instability. That stated, the Board finds the Veteran's assertions of experiencing problems with balance and instability in the months leading up to his August 2006 surgery to be compelling and credible. As such, the Board resolves all doubt in the Veteran's favor and finds that the Veteran's right knee instability was moderate in degree prior to August 17, 2006, and as such, the assignment of a separate 20 percent rating for right knee disability under Diagnostic Code 5257 for that period is warranted.

The Board has considered whether additional ratings are warranted under other diagnostic codes during this time period. 

As stated above, Diagnostic Code 5258 provides that a 20 percent rating is assigned for dislocation of the semilunar or meniscal cartilage of the knee, with frequent episodes of "locking," pain, and effusion into the joint. Diagnostic Code 5259 assigns a 10 percent rating when the joint remains "symptomatic" following removal of the meniscus. 38 C.F.R. § 4.71a. The evidence of record does not contain evidence of locking of the joint nor were there any loose bodies noted on X-ray prior the Veteran's August 2005 total knee replacement and during the period under review. See July 2005 Dr. P.K.B. Examination Report; see also December 2017 Hearing Transcript. In the absence of dislocation of cartilage of the knee seen on X-ray or any locking, assignment of a rating under Diagnostic Code 5258 is not appropriate. 

The provisions of Diagnostic 5259 better reflect the Veteran's disability prior to his total knee replacement, as he reported painful movement post partial meniscectomy. Pertinently however, the Veteran is already in a receipt of a 10 percent rating based precisely on painful and limited motion. To assign a separate 10 percent rating under Diagnostic Code 5259 would, in this case, compensate the Veteran twice for the same symptoms. 

The Board has considered the Veteran's lay statements regarding the functional impact of his right knee disability. The Veteran is competent to report his own observations with regard to the severity of his right knee disability, including reports of pain and limited mobility. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). The Board finds his statements to be credible and consistent with the ratings assigned. To the extent he argues that his symptomatology is more severe, his statements must be weighed against the other evidence of record. Here, the specific examination findings of a trained health care professional are of greater probative weight than the Veteran's more general lay assertions.

In considering whether additional and/or increased ratings might be assigned for the service-connected right knee disability under other Diagnostic Codes during the applicable period here, there is no evidence of ankylosis of the right knee, and a separate rating under Diagnostic Code 5256 is not warranted. Additionally, there is no evidence of limitation of flexion or extension to a compensable degree to warrant ratings under Diagnostic Code 5260 and 5261. Finally, there is no evidence of impairment of the tibia and fibula to warrant a rating under Diagnostic Code 5262, and genu recurvatum has not been objectively demonstrated as required under Diagnostic Code 5263. No higher rating is possible under Diagnostic Code 5003 or Diagnostic Code 5259, nor does the disability picture presented indicate that application of Diagnostic Code 5258 is appropriate, as noted above. 

In sum, the 10 percent rating currently in effect for the period prior to August 17, 2005 is maintained under Diagnostic Code 5003. A higher rating is not warranted. However, entitlement to a separate initial 20 percent rating for moderate instability of the knee is warranted for all times prior to August 17, 2005. 


ORDER

Entitlement to an initial disability rating in excess of 10 percent prior to August 17, 2005 for DJD right knee is denied.

Entitlement to a separate initial disability rating of 20 percent, but no higher, prior to August 17, 2005, for right knee instability is granted. 


REMAND

To adequately assess the severity of the Veteran's right knee disability for the time period subsequent to his total knee replacement [following the expiration of his 100 percent rating on October 1, 2006] the Board believes an additional knee examination is necessary. 

As stated above, the Veteran reported that he had experienced flare-ups since his total knee replacement in August 2005. See December 2017 Hearing Transcript. However, the Veteran's August 2006 and August 2013 VA examination reports indicated that the Veteran did not experience flare-ups. Moreover, the Veteran contends that his right knee disability has worsened since August 2013, which is when his knee was last assessed by VA. See December 2017 Hearing Transcript. 

The Court has held that in the case of a Veteran with a history of flare-ups, if the examination occurs when a flare-up is not being experienced, the examiner must ascertain adequate information-such as frequency, duration, characteristics, severity, or functional loss-regarding the Veteran's flares by alternative means, in order to estimate the Veteran's functional loss due to flares based on all the evidence of record. Sharp v. Shulkin, 29 Vet. App. 26 (2017). Moreover, if a medical examination report does not contain sufficient information to allow an informed decision to be made by the Board, the VA must obtain a new, adequate, examination. See Bowling v. Principi, 15 Vet. App. 1, 12 (2001); Ardison v. Brown, 6 Vet. App. 405, 407 (1994). In this case, given the Veteran's competent assertions of ongoing flare-ups and functional loss since having his knee replacement, and since prior VA examination reports dated from October 1, 2006 do not completely address this observation, an updated examination should be scheduled on remand. 

Additionally, the Board finds it necessary to remand the issue of entitlement to a TDIU for initial development and consideration. During the December 2017 Board hearing, the Veteran reported that he retired from farming earlier than he planned due to his right knee disability and described the impact that his right knee disability had on his ability to farm. On remand, the Veteran should be asked to file a VA Form 21-8940, "Application for Increased Compensation Based on Unemployability" to secure information about his work history, education and training and income. Further, given that the knee examination will include an assessment of the functional impact of the knee disability on the Veteran's daily life and his ability to work, such evidence would be relevant in the adjudication of TDIU. 

In light of the remand, any relevant VA or private medical records should also be requested. 38 U.S.C. § 5103A(c) (2012); see also Bell v. Derwinski, 2 Vet. App. 611 (1992).

Accordingly, the case is REMANDED for the following action:

1. Obtain any outstanding pertinent VA and private treatment records and associate with the claims file.

2. Send the Veteran an application for a TDIU (VA Form 21-8940, Veteran's Application for Increased Compensation Based on Unemployability) and an appropriate notice letter. 

3. Conduct any development needed to adjudicate the issue of entitlement to a TDIU even if the Veteran does not return VA Form 21-8940, Veteran's Application for Increased Compensation Based on Unemployability.

4. Schedule the Veteran for a VA examination to ascertain the current nature and severity of his service-connected right knee disability. The VA examiner is also asked to provide a retrospective medical opinion regarding the Veteran's historical reports of flare-ups. The claims file must be made available for review. All indicated tests and studies should be completed. 

The examiner must address the current functional impairment, if any, during flare-ups or when the right knee is used repeatedly. The range of motion lost during a period of flare-up or over-use should be indicated in degrees. If the examination occurs when a flare-up is not being experienced, or at a time without repeated use, the examiner must ascertain adequate information, such as frequency, duration, characteristics, severity, or functional loss regarding the Veteran's flares and/or repeated use by alternative means and estimate the Veteran's functional loss due to flares and/or repeated use based on all the evidence of record. 

The examiner should then review the record and provide a retrospective medical opinion regarding the functional impact, if any, of the Veteran's prior history of flare-ups. The examiner should solicit information, such as, the frequency of previous flare-ups; the symptoms associated with such flare-ups; and duration of flare-ups; and a description of pain and duration of such pain during a flare-up. The range of motion lost during these historical periods of flare-ups should be approximated in degrees, to the extent possible.

The examiner is also asked to comment upon functional impairment or loss caused by the Veteran's knee disability, and the extent to which it affects his daily life and ability to work. 

If it is not feasible to determine any of the above-requested information without resort to speculation, the examiner must provide an explanation for why this is so. It must be clear that the inability to provide an opinion is predicated on lack of knowledge among the "medical community at large" and not the insufficient knowledge of the specific examiner.

All opinions expressed should be accompanied by supporting rationale

5. After completing the above, and any other development as may be deemed necessary, readjudicate the issues on appeal, to include entitlement to a TDIU. If the benefits sought remains denied, in whole or in part, the Veteran and his attorney should be issued a Supplemental Statement of the Case. An appropriate period of time should be allowed for response. 

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

These claims must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C. §§ 5109B, 7112 (2012).



____________________________________________
V. CHIAPPETTA
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs